The next case for today is 2019-60795 Antonio Johnson v. VT Halter Marine. You may proceed. Good morning, your honor. May it please the court, my name is Carlos Moore. I represent the appellant Antonio Johnson. This case presents the issue of whether defendants are entitled or were entitled to summary judgment on Mr. Johnson's claims of a hostile work environment, race discrimination, and retaliatory discharge in violation of both Title VII and Section 1981. To establish a hostile work environment, my client, the plaintiff, the appellant here, had to prove that he belonged to a protected group, was subjected to an unblocking harassment, the harassment complained of was based on race, the harassment complained of affected a term, condition, or privilege of employment, and the employer knew or should have known of the harassment in question and failed to take prompt remedial action. Mr. Moore, on the claims of harassment of the hostile work environment, is there evidence in the record that your client promptly reported those things other than the one comment on the speakerphone? Is there any record that those were reported so that remedial action could be taken? I thought the evidence is, in fact, to the contrary. Can you help us with that? Yes, thanks, Judge Elrod. My client, Mr. Johnson, did complain of several different incidents. We'll start with Nathan Shepard back in September of 2013. That's the incident where the earplugs were thrown at him by Mr. Shepard. Mr. Shepard received no reprimand. However, that incident was reported to the supervisors of Mr. Shepard by the witnesses, co-workers of Mr. Johnson. And the next incident involving Cecil… Did he complain? Did he complain or did he say, I don't want to complain or say nothing? There were five incidents. In regards to Mr. Shepard, Mr. Johnson did not complain. He did complain in regards to Mr. Maxwell. He reported that to the HR manager. He didn't do it in writing, but he verbally reported it to the HR manager. And so he did complain about the copper brash washer being thrown at him in July of 2014. And I believe the HR manager had Mr. Maxwell to apologize verbally, but Mr. Maxwell's apology was not really sincere. He wouldn't have done it had he not been asked to do it by the HR manager. In regards to Mr. Anderson, Zachary Anderson, the incident that occurred in October of 2014, that's the one where the torch tip and soapstone were actually thrown and actually hit Mr. Johnson. He reported that to both his supervisor and the HR manager. He actually did a written report there. And all that happened to Mr. Anderson was that he received a verbal warning and Mr. Johnson was ridiculed by his supervisor, Mike Albert, for being a robot. So he did complain. Other than the incident with the speakerphone, is there any link between these incidents and race that's in the record? Yes, Your Honor. We believe there is a link. Based on Mr. Johnson's deposition testimony, he testified that the Moss Point Yard, the Hawthorne Marine Yard in Moss Point, had a reputation as being the good old boy yard. It was known for racial discrimination. He was told that by Mike Albert, the warehouse manager. And that's the one where he was actually assaulted and battered by the object hitting him. But I mean, it's unfortunate that we have to ask this, but this is the law in the area. Is there anything that indicates that the person threw the thing at your client because of his race rather than just because he was frustrated that he wasn't getting the supplies that he wanted and your client was following the rules to the letter? There is no direct evidence, but we believe from the totality of the circumstances, it can be inferred that it was because of his race. This has never happened to any other employee, white employee at the yard. So we believe it can be inferred and the totality of the circumstances which this circuit requires could infer that this was done because of his race. And this happened in a short period of time. I know in the Hernandez case, the court said that two times over 10 years was not severe and pervasive. But here we have from 2013 to 2017, you have five incidents. This man was physically assaulted several different times. He was afraid to go to work. He worked under duress. He never knew when someone was going to throw another object at him. Did he ever report that he was afraid to go to work to anyone? Was that ever reported? After the N word was used, I believe that was the proverbial straw that broke the camel's back. But he did report to Mike Albert that he was afraid to go to the Moss Point yard. He even posted on Facebook because it was a good old yard. He did not want to be set up for failure. He knew he was going to have a problem over there with racism and he did. Counsel, regarding the incident with the speakerphone to which you were just referring, wasn't there prompt remedial action in the record and that the person was suspended for three days? There was a suspension of three days, but the problem is that my client, after he complained of the racial epithet, he was terminated within a month and a half of complaining. Well, that's another claim. That's not about you. I'm asking for your hostile workplace claim. That was that you're right that we can talk about that in the context of the retaliatory discharge. But right now, it's just hostile work environment. How can that claim if he's getting immediately getting prompt remedial action and in a split record where the guy still says he didn't say it, he's getting the discipline. So they're taking this pretty seriously. We did believe they took it serious, but they did not comply with their own policy. The policy zero tolerance. I don't believe a three day suspension is zero tolerance. I mean, to use that word, there's no strong racial epithets in the English language to be used against African American. I totally agree with you. And we're not trying to in any way say that that's not a horrible thing to say. And no one should say that. Please do not construe the argument. The questions to be saying anything of the sort. Yes. And I don't take it. I believe the court recognizes the offensive nature of that word. And but a three day suspension should have been. It should have been more than three days suspension should have been a termination immediate because they have a zero tolerance policy. Even where they're not sure if he actually did it or not. They're kind of split on that. That's what the totality of the circumstances they did comment that the way that Mr. Johnson appeared upset when he came to report it, they knew something had occurred. They had reason to believe that something really had occurred. It was just not made up. He had a witness. And so you had the two black people saying that he used the N word. And you have the two white people saying that he said black person, a white person for them to go so far as to give a three day suspension. They knew that something had occurred. They wouldn't have given a three day suspension if they really didn't believe something amiss had occurred. They just did not go far enough because he had been a 30 year employee. They gave him a pass. But the policy said zero tolerance. I don't give you a 30 year employee or 40 year employee. When you use the N word, you need to go. What's your best case that this is a hostile work environment under our circuit precedent? Under your circuit precedent? Well, of course, under the U.S. President Supreme Court, the Harris case is the best precedent. But under your circuit, I believe the EOC versus WC and M Enterprise Incorporated or 96 F third three ninety three fifth circuit 2007. I believe that's the best case. That case held a proposition that the court can consider incidents of non race based harassment when determining whether the harassment experienced under a hostile work environment claim was sufficiently severe pervasive. So, I mean, had it not been for the the N word of the speakerphone, if that was if that had been the only thing, I don't believe he would have had a hostile work environment claim. But if you look at these other incidents in combination with the N word over the speakerphone, I believe this was clearly a hostile work environment. Or at the least, it was a genuine issue of material fact that a jury, a reasonable jury, could believe that this man experienced an abusive work environment. I believe the law says so long as the environment would be reasonably perceived and is perceived as a hostile or abusive, there is no need for it to be psychologically injurious. So we believe that we didn't have to prove that he was psychologically injured, but his his job was made to be tougher than it had to be based on these incidents. Counsel, on your retaliatory discharge claim, the opposing counsel, assuming arguendo that you meet all the standards and we get to why why was your client terminated in their position is that everybody was terminated in that tool group and nobody else was hired. Do you have anything to rebut that nobody in the tool group got hired during the time in question that that they were they were laying lots of people off? And while they may have hired people to be other special skill levels that the tool people, not skill level, were not being hired. Thanks for that question, Judge. I believe what we have to rebut the pretextual reason for the termination is that the vice president of production, Hank Stewart, told Mr. Johnson after the two wrong people were laid off in January of twenty seventeen that they were now at the minimum level, his job was secure. There will be no more layoffs in the tool room. So four months later, promising that, though, because they were still laying people off in the tool room, weren't they? They because it was really bad that they're having lots more layoffs in May, I think. And in other times, it was a bad situation for that, that that business, but not in the tool room. The nine employees in the tool room in the warehouse and the tool room had already been laid off in January of twenty seventeen. So, of course, my client was concerned that he would be next. He was reassured by the vice president of production that they were now at the minimum level. Three was the minimum they could have in the tool room and he would not be laid out. And so for something to change, I'm not talking about a year and a half later, I'm talking about four months later. I mean, it totally changes. That was a people were fired four months or laid off four months later, too. Right. But not in the tool room. OK, but I'm just saying that, I mean, as we've seen and I know this wasn't the case back then, but with the covid crisis, you think everything's going one way and then, boom, it goes another way. So the fact that something might change, I don't I don't know. I mean, I don't see how that by it's if he'd been the only person fired four months later, I think that'd be a different story. But they're continuing to lay off people. And he was next in terms of seniority. Right. I would agree with that, judge. If this had not been on a motion for summary judgment, the facts had to be construed in the favor of most favorable to the non-moving party. My client was a non-moving party. We believe we created a question for a jury to decide. The jury may very well believe that since other people were terminated and made that my client was terminated because of the reason that the employee said, we just are arguing that it was not proper for summary judgment. Do you have anything else, Mr. Moore? Those are my arguments, basically. OK, thank you. We appreciate your arguments and you save time for rebuttal. Mr. Maverick, you may proceed. Oh, you're on mute. I did that twice today already. So can you hear me now? OK, let's take these claims one at a time. First, the hostile work environment claim based upon the acts of four individuals in 2013 and 2014. Mr. Johnson testified in his deposition he had no facts whatsoever to show that his race played any part in those episodes. I understand that Mr. Moore argued that his supervisor, the warehouse supervisor, Michael Albert, ridiculed him by saying he was performing his job like a robot. Nothing could be further than the truth. He liked Mr. Albert. Mr. Albert did make that statement. And the statement that was made in return was, that's how I was trained, like a robot. And that was the reason for some of the episodes that occurred. Again, he testified he had no facts to suggest that his race was a factor. As to the good old boy shipyard, only one episode occurred at that shipyard, Knox Point Marine. And that was the one where a person that he liked, Sherry Henry, who was the HR manager at that shipyard. So a woman in charge of human resources at the good old boy network yard, heard the complaint and did have the individual apologize. Again, no evidence whatsoever that there was race involved in any of those episodes. Now let's turn to David Newell, a production superintendent who was not a supervisor of Mr. Johnson. And the racial slur that allegedly occurred in 2017, two and a half years after these episodes at the other shipyard. The background was that, once again, the superintendent, excuse me, Mr. Newell, sent a worker down to get a long length of rope for a LNG vessel that they were getting ready to launch, which is a very time-sensitive procedure. And Mr. Johnson said he would not issue the rope to the individual. He had to get his superintendent's permission. So yes, he called on a cell phone, put him on a speaker phone. The superintendent did not know Mr. Newell. He was on the phone. And he asked who was there. His account was the white guy or black guy. There was the individual who had gone to the tool room. He said the same thing. Mr. Johnson and an individual who was on light duty in the tool room said that he used an unacceptable, intolerable under any circumstances racial slur. He promptly made a complaint under the Equal Employment Opportunity Harassment Policy, which he had been knowledgeable of since he had become an employee. And he made no such complaint against four individuals. He made the complaint, and there was a prompt investigation that involved two different human resources, a manager, an assistant, and the human resources manager for the entire company, the corporate HR. And he's right. Based upon some of the extrinsic evidence, which was he seemed nervous, he seemed like he was uncomfortable, and he promptly reported it. Secondly, the individual who supported Newell's statement seemed to be uncomfortable when he provided his written statement. And because of that, even in light of the mitigating factors, which was a dispute in the testimony, and they researched Mr. Newell's employment history. A 30-year employee, and he had not had a single complaint of any kind against him during that 30 years of employment with the company. They nevertheless concluded that on balance, they would take the remedial action, which was a three-day suspension without pay, and a final written warning, and requiring him to reread and resign the EO policy. By the way, Mr. Newell had been trained on the EO policy, and he had received special training some three years earlier by legal counsel that was a supervisor's special obligations under that policy. So he was aware of the policy, as was Mr. Johnson throughout his employment. Mr. Moore says that, well, he should have been fired, and the fact that he's not shows some evidence of the hostile work environment. Could you address that? There is no obligation to fire for every offense. They took the reasonable action under the circumstances, including Mr. Johnson's, during the investigation, pointed out that he was very surprised that Mr. Newell had made the comment, because Mr. Newell had come by the tool room on many occasions. He was always friendly. He joked around with Mr. Johnson, and he couldn't believe he had made the comment. Given the disparities in the evidence, I think the disciplinary action that was taken was appropriate. Going to the retaliatory discharge, it did occur one and a half months after the report under the EO policy. And we presume, for the sake of summary judgment, that a prima facie case was established by the report that he made to Human Resources by the length of time only a month and a half in between that and the termination of his employment, but demonstrated, without any controverting evidence, ongoing reductions in force, including a reduction in force that was the very month after, and it was contemplated in progress, after his termination, that began what ended up being 120 employees during 2017, 110, excuse me, during 2017, who were terminated as part of the reduction in force. To go to the tool room, and I want to address particularly because it is an issue that was not specifically raised in the district court, and that was the Mr. Johnson's testimony about the assurance he supposedly received from the vice president of production about that he would not be included in a reduction in force. Well, we need to take a look at that in context. First of all, in support of his position, the opposition to summary judgment cited only a portion of Mr. Johnson's testimony about his conversation with the superintendent. It was successive pages, but only the second page was included in the record support that was submitted in opposition to summary judgment. For that reason, we supplemented the record and put in the entire testimony of Mr. Johnson about that statement, which is arguably hearsay, but certainly not clear cut. But when you take in context what was said, and we have quoted it, I believe, in our brief before the court, what the superintendent said, number one, it came in the wake of a termination of nine employees as part of a reduction in force, 12, excuse me, including five warehouse employees, which is the department where our tool room attendant is. There was no tool room attendant included in that rip. This was in January of 2017. There were, as I said, a number of warehouse employees. Mr. Johnson took it upon himself to stop by the Vice President of Production's office for a visit after that reduction in force, and he said that, I want to just tell you, I want to thank you that I was not included. Now, I know I could be included next week, maybe my week, but I want to thank you for me not being included in the most recent reduction in force. And the production manager, giving assurance like I believe any manager would, said, oh, wait, you don't need to be concerned about that. Oh, I'm sorry, I omitted one thing. He did say, I understand there is going to be a reduction in force coming up that will involve a number of production employees. He said, you don't need to worry about that, because we're at a minimum in the tool room, and you're not going to be included in that. Well, that was some four months before he actually was included in the termination of reduction in force. Over that four months, there was indeed, the very next month after his conversation with the Vice President of Production, a reduction in force involving some 12 employees. There were no warehouse employees, no tool room attendant included in that, just as the production Vice President had assured. Council, after he was terminated, did they put anybody else in the tool room, or they left it with two people the whole time? They left it with two tool room attendants, both of whom were more senior by several years than Mr. Johnson, and that's the reason they were retained. Did they allow any of the other RIF people of his level to transfer to the other facilities or something? Was he deprived of a chance to transfer? I'm just trying to cover all the bases. Unfortunately, that was part of the problem. It was in December of 2016, when because of the same economic conditions, they shut down their other two shipyards. The Pascagoula shipyard, called Pascagoula, was the only shipyard. There were three tool room attendants, one for each shipyard. There were still three tool room attendants. When they had shut down the other two shipyards, all of them were in Pascagoula, and the decision was made in the wake of upcoming, over 100 employees being included in future reductions in force in 2017 on, that it came up that they needed to reduce from three to two. It was the first cut in the tool room, and again, they applied indisputably objective criteria, i.e. seniority. Who was hired first? And the two women who were in the tool room had greater seniority by several years than Mr. Johnson, and that's why he was included. So I think the argument that Mr. Moore has made certainly ignores the overall big picture. Counsel, do you have anything else for us? I do not. Okay, thank you. We have your argument. Mr. Moore, you saved time for rebuttal, sir. You may proceed. You need to take yourself off of mute. Thank you, Your Honor. Mr. Johnson was the least senior of the three tool room employees, but he had a perfect record. He did not have any prior disciplinary history within a year of being terminated. The same cannot be said of the black female that was a tool room attendant. He has stated that she had, he knew that she had been written up, and she had been written up within the last year. And so their policy said they followed seniority unless there had been disciplinary measures within a year. So we believe it is a question of fact. The general issue of material fact exists whether or not he was let go instead of heard because of this complaint about the N-word that he heard over the speakerphone. And so that's another reason we believe that this should have gone to a jury and not have been summarily dismissed on summary judgment. You had asked earlier, and I did not complete my thought about, did he report individually each incident of harassment? And I had got, I covered Cecil Maxwell and I covered Zachary Anderson. He also was harassed by Russell Woodard, and he did report that verbally to HR. And there was no reprimand of Russell Woodard. This man used profanity and was very hostile towards Mr. Johnson. So out of the five incidents that occurred, Mr. Johnson reported four of the five incidents. The only incident that he did not personally report was the Nathan Shepard incident. And so in many of those incidents, human resources failed to do anything. There was no reprimand. And if there was anything done, there may have been a slap on the wrist. The only thing that was taken seriously was the N-word, and that was a three-day suspension, a mere three-day suspension for something so offensive in the 21st century. And so we would present on the totality of the circumstances that Mr. Johnson should have been allowed to prove his case or submit his case to a jury, because this was five incidents within a four-year time period, so that's more than, on average, more than one a year, 1.25 cases a year of harassment. I found no case law to say that that's acceptable. The Hernandez case was two incidents over a 10-year period of time, and the court said that that was not severely, that was not severely pervasive. But I would believe, any court would believe, and I'm asking you to find that five incidents over four years, that's severe and pervasive. No one should have to endure that just to work and make a living for his family. In conclusion, when everything is considered in totality of the circumstances, we believe the court was wrong to grant summary judgment in relation to the hostile work environment claim. We also believe that there was evidence officially rebutted to contest a pretextual claim for the reason for the termination. We believe that should have gone to a jury, so we'd ask the court to reverse and remand the case. You're still muted. I'm muted? No. I'm saying thank you very much, Mr. Morse, and Judge Haynes is telling me that you can't hear me say that. So that started the day that way, and I'm ending the day that way. Hopefully tomorrow I'll do better. Thank you very much. We appreciate both of your arguments. It's been helpful to the court. This case is submitted, and we will stand in recess until tomorrow morning at 9 a.m. Thank you.